# PRELIMINARY

# <u>LIFE CARE PLAN</u>

**CLIENT:  Hunter Dawkins**

**DATE OF BIRTH:  March 18, 1983**

**DATE OF INJURY:  April 16, 2005**

**Prepared by:  Sharon L. Reavis, R.N., M.S., C.R.C., C.C.M.**

**April, 2006**

## **INTRODUCTION**

Hunter Dawkins is a 23-year-old male, who experienced catastrophic injuries pursuant to a rollover motor vehicle accident, which occurred on 04/16/05. Subsequently, Mr. Dawkins has undergone extensive acute care and rehabilitation, but continues to demonstrate a permanent disability with multiple handicaps to daily living. Mr. Dawkins would benefit from a comprehensive plan of care that details those services necessary to allow him to remain as independent and functional within the confines of his disability. Although he will never regain his premorbid status, he should be provided those services necessary to maintain independence.

Hunter Dawkins is the son of Debbie and Craig Dawkins, and was attending Catholic University majoring in Political Science at the time of his injuries. His plan was to attend law school after college. Mr. Dawkins grew up in Pass Christian, Mississippi and was an honor student in high school. He also served as manager of the basketball team, participated on the golf team, and in the Fellowship of Christian Athletes. Mr. Dawkins was a National Honor Society graduate at St. Stanadas Preparatory School, where he attended grade 7 through 12. His senior year in high school he did serve as a page for the Lt.

1

Governor of Mississippi and the Governor as well. In college, he participated in internships for members of congress and acted as press secretary, field director for Congressman Shows. Mr. Dawkins was in good health before his injuries and enjoyed total independence within his home and the community. He was living, at the time, in an apartment in Washington, D.C. with other students and was looking forward to graduation.

Pursuant to his injuries, Mr. Dawkins now requires oversite, structure, and supervision, as well as medical and community support. The following report details his medical history, his current status, and outlines those services which he will require to maintain his highest level of independence.

## MEDICAL HISTORY

Hunter Dawkins is a 23-year-old young man who sustained a traumatic brain injury pursuant to a rollover motor vehicle accident. The accident occurred on 04/16/05. According to hospital records, Mr. Hawkins was partially ejected from the vehicle and required a prolonged extrication of approximately 30 minutes. He was transported to Washington Hospital Center

Trauma Unit (MedStar) where on arrival he demonstrated a Glasgow Coma Score (GCS) of 3 and was unresponsive.  The right pupil was 4 mm in diameter and the left was 3 mm in diameter with sluggish response to light.  Mr. Dawkins was intubated by anesthesia in the trauma unit; however, despite respiratory assistance, continued to display oxygen saturations in the 70 to 80 range. A stat CT scan of the chest revealed a possible right pneumothorax and left pulmonary contusion with possible pleural fluid.  Bilateral chest tubes were placed resulting in improved oxygen saturation.  Head CT scan demonstrated multiple skull fractures.  A neurosurgical consult was requested and Mr. Hawkins was admitted to the intensive care unit under the care of Dr. James Jeng.  At the recommendation of the neurosurgeon, intracranial pressure monitoring was initiated and orders given to maintain the intracranial pressure below 20.

Once in the intensive care unit, Mr. Dawkins' Glasgow Coma Scale was upgraded to 5.  Upon further evaluation, he was found to have reduced voluntary movement or reactionary movement to the right side.  There was some movement of the left upper and lower extremities to painful stimuli; however, this response was absent on the right.

On 04/21/05, due to anticipation of a prolonged intubation, Mr. Dawkins was taken to the operating room for a tracheostomy. The procedure was performed by Dr. Jeng with no complications reported.

On 04/22/05, Mr. Dawkins' GCS was upgraded to a 6. However, he was still not oriented or following commands. A differential size in pupils was still noted with no spontaneous eye opening.

On 04/28/05, Mr. Dawkins was transferred to the floor. He had been weaned from the ventilator and was maintaining good oxygen saturations on 40% trach mask. Prior to transfer, his intracranial pressure monitoring had also been discontinued.

On 05/04/05, Mr. Dawkins underwent PEG (percutaneous endoscopic gastrostomy) tube placement by Dr. Michael Williams. Tube feedings were initiated with no problems reported.

On 05/10/05, Mr. Dawkins was transferred to National Rehabilitation Hospital where he was placed under the care of Dr. Andrew McCarthy. On admission, Mr. Dawkins was dependent in all areas of mobility, self-care, and was unable to communicate. While in acute rehab, Mr. Dawkins made slow steady recovery.

His family was very involved and supportive. By discharge, his hemiparesis was much better and cognition more fluent. He was also remembering things better, although still became confused and required 24-hour supervision.

A modified barium swallow was completed which revealed no aspiration. An EEG also demonstrated no epileptiform activity, although there was bilateral slowing, consistent with confused disturbance.

According to the physical therapist's discharge summary, Mr. Dawkins was independent with all bed mobility and bed to chair transfers. In addition, he could ambulate independently short distances in a static environment, although required close supervision to occasional verbal cues in dynamic environments. Prior to discharge, Mr. Dawkins was provided a home exercise program with written and pictorial instructions. His sister and mother were also educated regarding how to provide mobility assistance and care for Mr. Dawkins.

The occupational therapist additionally noted in her discharge summary that Mr. Dawkins either met or exceeded his goals with self-care activities. With regard to bathing, he was showering in standing position $\geq$ 50% of the time while sitting

for lower extremities and foot care with minimal verbal cues for technique and sequencing.  In addition, he able to dress himself at a seated level with minimal verbal cues and able to ambulate without an assistive device to a standard toilet and shower seat in a bathtub with supervision and minimal verbal cues for technique and pacing.  He was also self-feeding and writing with his right hand, as well as using his right upper extremity 75% of the time during bathing and dressing.

The speech therapist also reported Mr. Dawkins had made excellent progress while in rehab and had exceeded his goals in most areas.  By discharge, he was able to participate in a three hour community outing in a distracting environment without redirection.  He displayed adequate safety awareness and insight into his impairments.  He was able to verbally communicate basic wants and novel ideas without difficulty.  Verbal expression was adequate for structured conversation.  He was able to follow multi-step commands and answer grammatically complex questions without difficulty.  Discharge diagnosis was moderate cognitive-linguistic impairment.  Swallow function was normal.

On 07/02/05, Mr. Dawkins was discharged home with his family.  He was referred to NRH Regional Rehab at Irving Street to the Transitions Neurological Day Treatment Program with an

anticipated starting date of 07/12/05. He was advised to see his primary care doctor within two weeks of discharge to re-establish care and for ongoing medication management. A follow-up appointment was also scheduled with Dr. McCarthy for 08/31/05. Discharge medications included Cleocin, Benzo-peroxide, and Aquaphor. Dr. McCarthy also listed significant comorbidities as follows:

1. Multiple stable fractures.

2. Subarachnoid hemorrhage.

3. Parenchymal brain contusions.

4. Bilateral pneumothorax treated with chest tubes.

5. PEG tube.

6. Tracheotomy.

7. Pneumoperitoneum.

8. Right hemiplegia on admission.

9. Anemia.

10. Dyspepsia.

11. Traumatic optic neuropathy of left optic nerve resulting in blindness.

On 08/16/05, Mr. Dawkins underwent an initial occupational therapy evaluation at Methodist Outpatient Rehabilitation Center. He was currently living with his mother in an apartment

in Jackson, Mississippi. At the time of the accident, Mr. Dawkins was attending Catholic University.

Mr. Dawkins was alert and cooperative during the evaluation. He followed instructions, requiring repetition of instructions infrequently. Responses were slightly delayed and he was frequently hyper-verbal, providing unnecessary and occasionally irrelevant information. Mr. Dawkins made numerous word-finding and word substitution errors during the evaluation. Grip strength and coordination were decreased bilaterally. He exhibited a significant left visual field defect. He also reported blurred vision in the morning when transitioning from sitting to standing. Mr. Dawkins exhibited some difficulty with immediate recall and demonstrated significant difficulty with mathematic reasoning when presented in the form of word problems. Mr. Dawkins reported being independent with all basic self-care skills and money management.

The occupational therapist opined that Mr. Dawkins could benefit from three days of individual and group therapies at the Quest Program for four to six months.

On 09/08/05, Dr. James Irby summarized the progress Mr. Dawkins had made while participating in the Quest Program. He

8

had attended five individual and group therapy sessions receiving physical, occupational, and speech therapy as well as neuropsychological services. Therapies focused on improving his ambulation, strength, balance, coordination, and endurance. He was additionally working on expressive/receptive language, memory, problem solving, and mathematics. He had also been involved in individual and group psychotherapy to assist in coping and adjustment, as well as to monitor for depression. Mr. Dawkins was noted to be fully engaged in treatment and making good progress toward his goals. It was recommended he continue in the Quest Program three times a week to assist in transitioning back to independent living and work.

On 09/08/05, Mr. Dawkins underwent a comprehensive psychiatric evaluation by Dr. William Cook. Dr. Cook noted that over the past few weeks Mr. Dawkins had become increasingly frustrated and depressed. His mood was depressed and he had some impairment in abstracting abilities. Insight and judgment were also slightly impaired. Dr. Cook's diagnostic impressions were noted as follows:

Axis I:        Major depressive disorder, single episode,
               severe
Axis II:       Deferred

Axis III:        Status post traumatic brain injury

Dr. Cook recommended Zoloft, starting at 25 mg for one week and then increasing to 50 mg daily.  A follow-up appointment was scheduled on 09/21/05.

On 09/15/05, Mr. Dawkins was seen by Dr. Ching Chen for an ophthalmological evaluation.  Mr. Dawkins was blind in his left eye and reported the visual acuity had gotten much worse in his right eye since the accident.  Dr. Chen's impressions were noted as follows:

1.    Optic atrophy, left eye.

2.    Partial atrophy, right eye.

He recommended visual field testing during the next visit.

On 09/21/05, Mr. Dawkins returned to Dr. Cook for a medical psychotherapy session.  According to Dr. Cook, Mr. Dawkins was going blind, but not aware of it at this time.  His mood was reportedly less depressed than at the last session.

Mr. Dawkins was re-examined by Dr. Chen on 09/29/05. He underwent visual field testing, which revealed no significant

visual defect.  Mr. Dawkins' vision had been refracted to 20/20.
A prescription was written for polycarbonated safety glasses.

On 10/05/05, Mr. Dawkins reported to Dr. Cook that the
Zoloft was making him sleepy taking it in the morning and that
the ophthalmologist had given him a good report regarding his
vision.  Provigil was prescribed for morning fatigue and Mr.
Dawkins was advised to take the Zoloft at bedtime.

Mr. Dawkins was seen by Rusty P. Riley, DMD on four
occasions from 10/13/05 through 12/15/05 for prophylaxis and
dental repair.  According to Dr. Riley's office note, he had
nine fractured teeth, which were subsequently repaired.  A
referral was to be made for evaluation of Mr. Dawkins' wisdom
teeth.

Mr. Dawkins was seen by Dr. Cook on four occasions from
10/20/05 through 01/16/06.  He continued to make gradual
improvement.  His mood remained euthymic.  No changes were made
in his plan of care.

On 11/10/05, Mr. Dawkins was evaluated by Dr. Stuart Yablon
at Methodist Rehabilitation Center.  Mr. Dawkins reported having
difficulty with the vision in his left eye and hearing in his

right ear. He additionally complained of right upper extremity weakness, which he stated was "getting better every day". He denied having headaches, seizures, or falls. Current medications included Provigil and Zoloft. Dr. Yablon's assessment was noted as follows:

1.    Traumatic brain injury.

2.    Left field cut, right neglect.

3.    Depression.

4.    Difficulty hearing.

Dr. Yablon recommended Mr. Dawkins follow-up with Dr. McCarthy in six months.

On 12/01/05, Dr. Irby noted Mr. Dawkins continued to receive physical, occupational, and speech therapy in addition to neuropsychological services through the Quest Program at Methodist Outpatient Rehabilitation. He continued to make improvements in strength, balance, and endurance. His mood was stable and he was engaged in the program. He had begun part-time work (20 hours per week) as an intern in the attorney general's office. However, according to Dr. Irby, Mr. Dawkins continued to demonstrate generalized cognitive impairment, including language impairment and some mild deficits in social

skills.  Dr. Irby recommended he continue in the Quest Program 2-3 times a week.

On 01/13/06, Mr. Dawkins underwent a driving evaluation at Methodist Outpatient Rehabilitation.  After several retraining sessions, Mr. Dawkins demonstrated adequate skills for limited driving.  He was aware of his surroundings and aware of any changes in roadway conditions.  He did well merging into the traffic on the interstate, utilized appropriate scanning techniques, and followed all directions very well during the assessment.  It was recommended he refrain from nighttime and interstate driving.  In addition, driving should be limited to work, grocery store, and for emergencies.  He should also refrain from using his cell phone or having conversations with passengers while driving.  Retesting was recommended in two months.

Mr. Dawkins returned to Dr. Cook on 02/20/06 with his mother present for part of the session.  He wanted to decrease his Zoloft dosage and eventually discontinue the medication. Dr. Cook noted his judgment seemed to be impaired regarding his need for medications.  Mr. Dawkins stated he was feeling tired on the Provigil, but did not want to increase the dose.  Dr.

Cook decreased Mr. Dawkins' Zoloft dosage, although it was against his medical advice.

Mr. Dawkins was seen again by Dr. Cook on 03/13/06. He appeared to be doing well on the decreased Zoloft dose. His mood was euthymic and he was sleeping and eating okay. He was taking up to two Provigil daily for energy and concentration. Dr. Cook recommended he continue Zoloft 50 mg at bedtime and Provigil 200 mg twice daily.

## CURRENT STATUS

Mr. Hunter Dawkins presents as a pleasant 23-year-old male, who is right hand dominant, is 5 ft. 11 in., and weighs 230 pounds. Mr. Dawkins lives in Jackson, Mississippi in an apartment complex where his mother, Debbie, resides when the Mississippi legislature is in session. Ms. Dawkins is a senator for the State of Mississippi.

Mr. Dawkins currently works as an Assistant in Public Relations for the State Attorney General's office. In general, he pulls up press releases, lobbies senators, hands out bills,

works on press conferences, etc.  Mr. Dawkins lives in Jackson during the week, but does return to Pass Christian occasionally on weekends.

Personal care activities take an extended time and are more difficult for Mr. Dawkins; however, he is relatively independent in his personal care.  He has been cleared to drive with restrictions of no interstate traffic and no nighttime driving or driving with cell phones, which limits his driving approximate to work, local stores, etc.  Mr. Dawkins does live in his own apartment.  However, he does adhere to a very structured routine and does not vary from his structure.  Most of his time, when not working, is spent in his apartment.  His mother provides oversite for financial and day to day activities.

Mr. Dawkins is blind in the left eye and demonstrates right hemiparesis with lower extremity weakness, more pronounced than upper extremity weakness.  Fatigue is present.  He does take Provigil to assist with focus, concentration, and to promote energy.  Fine motor difficulties are present and he does have difficulty writing with his dominant hand.

Perseveration and digression in speech is prominent with difficulty focusing and staying on topic. Confabulation is present, as well, and he does have difficulty responding to questions.

Balance is problematic with an altered gait and Mr. Dawkins must carefully survey his environment to compensate for balance.

Although Mr. Dawkins' mood has stabilized he continues to require medication for depression. In addition, cognitive deficits continue to be problematic with deficits in social skills as well.

## CONCLUSION

Mr. Hunter Dawkins has experienced significant injuries, which have precipitated both physical and cognitive impairments which are permanent in nature. He has worked extensively to compensate for his disabilities and to participate in a very comprehensive rehabilitation program. However, Mr. Dawkins will require both household and community support, as well as oversite and medical surveillance to remain safe and independent

within the community.  He will require ongoing medical services and intermittent rehabilitation as well.  The following Life Care Plan describes these services and outlines the cost of care.

# PLAN DESCRIPTION

## Hunter Dawkins

I.      **EVALUATIONS**

Ophthalmological evaluations are requisite for at least several years to make certain of delayed trauma effects. Mr. Dawkins does wear glasses and these should be safety glasses, as he has only one viable eye. In addition, neuropsychological evaluations are appropriate to monitor any changes and to make further recommendations for cognitive or other interventions.

II.     **DRUGS AND SUPPLIES**

Medications are appropriate to address cognitive deficits, endurance, and fatigue, as well as the psychological sequelae of Mr. Dawkins' injuries.

III.    **COMMUNITY LIVING**

A Life Coach is certainly appropriate to assist Mr. Dawkins in maintaining structure and functional activities, as well as provision for a safe environment and interventions for conflict resolution, etc. Mr. Dawkins should have the ability to live

independently with the appropriate community and household supportive services.

## IV. MEDICAL ROUTINE

On a routine basis, Mr. Dawkins should be followed by his physical medicine and rehabilitation specialist, as well as psychiatrist; and additional specialties may be required if complications ensue.

## V. THERAPIES

Individual counseling is certainly appropriate to provide support and address adjustment issues. Speech therapy is currently being provided and other therapies will be necessary to provide intermittent upgrades to his therapeutic program or therapeutic interventions directed toward life style changes. In addition, Mr. Dawkins should be involved in a regular exercise program to combat fatigue and assist with general conditioning and stamina.

# LIFE CARE / REHABILITATION PLAN

CLIENT: HUNTER DAWKINS
DATE OF BIRTH: 03/18/83
PREPARED:    April 26, 2006

## CATEGORY: DRUGS AND SUPPLIES

P - PERIODIC REPLACEMENT COST

Y - YEARLY COST

| SERVICE OR PRODUCT | PURPOSE | SUPPLIER | INIT./ TERM. | FREQUENCY | UNIT COST |
|---|---|---|---|---|---|
| ZOLOFT 50 MG (RX) * | ANTI-DEPRESSANT/ 1 X DAY | CVS PHARMACY JACKSON, MS 601-373-2111 | 2006 TO 2058 | YEARLY Y | $1,102.30 |
| PROVIGIL 200 MG (RX) | CNS STIMULANT/ 2 X DAY | CVS PHARMACY JACKSON, MS 601-373-2111 | 2006 TO 2058 | YEARLY Y | $6,241.50 |
| POLYCARBONATE LENSES | PROTECTIVE EYEWEAR | CUSTOM OPTICAL JACKSON, MS 601-362-6675 | 2006 TO 2059 | 1 X 2 YEARS P | $170.00 |

* Dosage may be titrated upward.

# LIFE CARE / REHABILITATION PLAN

CLIENT: HUNTER DAWKINS
DATE OF BIRTH: 03/18/83
PREPARED:    April 26, 2006

CATEGORY: EVALUATIONS

P - PERIODIC REPLACEMENT COST

Y - YEARLY COST

| SERVICE OR PRODUCT | PURPOSE | SUPPLIER | INIT./ TERM. | FREQUENCY | UNIT COST |
|---|---|---|---|---|---|
| OPHTHALMOLOGIST | EVALUATE POST TRAUMA STATUS/ 1 X YEAR | DR. CHING JYGH CHEN JACKSON, MS 601-984-5040 | 2006 TO 2008 | YEARLY | $100.00 |
| | | | | | P |
| NEUROPSYCHOLOGICAL EVALUATION | TREATMENT RECOMMENDATIONS | JAMES IRBY, PHD JACKSON, MS 601-981-2611 | 2006 TO 2059 | 1 X ONLY | $1,100.00 |
| | | | | | P |

2

# LIFE CARE / REHABILITATION PLAN

CLIENT: HUNTER DAWKINS
DATE OF BIRTH: 03/18/83
PREPARED:    April 26, 2006

P - PERIODIC REPLACEMENT COST

Y - YEARLY COST

## CATEGORY: COMMUNITY LIVING SERVICES

| SERVICE OR PRODUCT | PURPOSE | SUPPLIER | INIT./ TERM. | FREQUENCY | UNIT COST |
|---|---|---|---|---|---|
| BRAIN INJURY CASE MANAGER/ LIFE COACH * | OVERSITE FOR FUNCTIONAL DAILY ACTIVITIES/ STRUCTURE/ COMMUNITY INTEGRATION/ FINANCIAL OVERSITE/ 8 HOURS/WEEK | LOCAL PROVIDER JACKSON, MS | 2006 TO 2058 | YEARLY    Y | $35,360.00 |

* Additional services may be required to provide Home structure and support.

3

4

# LIFE CARE / REHABILITATION PLAN

CLIENT:  HUNTER DAWKINS
DATE OF BIRTH: 03/18/83
PREPARED:  April 26, 2006

CATEGORY: MEDICAL ROUTINE

P - PERIODIC REEPLACEMENT COST
Y - YEARLY COST

| SERVICE OR PRODUCT | PURPOSE | SUPPLIER | INIT./ TERM. | FREQUENCY | UNIT COST |
|---|---|---|---|---|---|
| PHYSICAL MEDICINE & REHABILITATION | MEDICAL FOLLOW-UP/ YEARLY | DR. STUART YABLON JACKSON, MS 601-981-2611 | 2006 TO 2058 | YEARLY | $100.00 |
| PSYCHIATRIST | PSYCHOTHERAPY W/MEDICATION MANAGEMENT/ 1 X MONTH | DR. WILLIAM COOK JACKSON, MS 601-366-3660 | 2006 TO 2007 | | $1,620.00 |
| | | | | | Y |
| | | | | | P |
| PSYCHIATRIST | PSYCHOTHERAPY W/MEDICATION MANAGEMENT/ 1 X 2 MONTHS X 2 YEARS | DR. WILLIAM COOK JACKSON, MS 601-366-3660 | 2007 TO 2009 | YEARLY | $810.00 |
| | | | | | P |
| PSYCHIATRIST | PSYCHOTHERAPY W/MEDICATION MANAGEMENT/ 4 X YEAR | DR. WILLIAM COOK JACKSON, MS 601-366-3660 | 2009 TO 2058 | YEARLY | $540.00 |
| | | | | | P |

# LIFE CARE / REHABILITATION PLAN

CLIENT: HUNTER DAWKINS
DATE OF BIRTH: 03/18/83
PREPARED:    April 26, 2006

P – PERIODIC REPLACEMENT COST
Y – YEARLY COST

## CATEGORY: THERAPIES

| SERVICE OR PRODUCT | PURPOSE | SUPPLIER | INIT./ TERM. | FREQUENCY | UNIT COST |
|---|---|---|---|---|---|
| INDIVIDUAL COUNSELING | SUPPORT SERVICE/ ADJUSTMENT ISSUES/ 1 X WEEK | DR. JAMES IRBY JACKSON, MS 601-981-2611 | 2006 TO 2007 | 1 X ONLY | $6,840.00 |
| INDIVIDUAL COUNSELING | INTERMITTENT COUNSELING/ 12 SESSIONS | DR. JAMES IRBY JACKSON, MS 601-981-2611 | 2007 TO 2058 | 1 X 2 YEARS | $2,280.00 |
| SPEECH THERAPY | SPEECH LANGUAGE SERVICES/ 1 X WEEK X 6 WEEKS | METHODIST OUTPT REHAB JACKSON, MS 601-981-2611 | 2006 TO 2006 | 1 X ONLY | $960.00 |
| SPEECH THERAPY | INTERMITTENT THERAPY/ AS NEEDED | METHODIST OUTPT REHAB JACKSON, MS 601-981-2611 | 2006 TO 2058 | AS NEEDED | ($160.00) |
| FITNESS MEMBERSHIP | CONDITIONING/ STRUCTURED EXERCISE | BAPTIST HOSPITAL FITNESS JACKSON, MS 601-968-1766 | 2006 TO AGE 55 | YEARLY | $564.00 |

5

# LIFE CARE / REHABILITATION PLAN

CLIENT: HUNTER DAWKINS
DATE OF BIRTH: 03/18/83
PREPARED:   April 26, 2006

CATEGORY: THERAPIES

P - PERIODIC REPLACEMENT COST
Y - YEARLY COST

| SERVICE OR PRODUCT | PURPOSE | SUPPLIER | INIT./ TERM. | FREQUENCY | UNIT COST |
|---|---|---|---|---|---|
| FITNESS MEMBERSHIP | CONDITIONING/ STRUCTURED EXERCISE | BAPTIST HOSPITAL FITNESS JACKSON, MS 601-968-1766 | 2038 AGE 55 TO 2058 | YEARLY | $444.00 |
| SUPPORT GROUP | EDUCATION/ SUPPORT | BRAIN INJURY ASSOC OF MS JACKSON, MS 601-981-1021 | 2006 TO 2058 | YEARLY | $.00 |
|  |  |  |  |  | P |

# LIFE CARE / REHABILITATION PLAN

## COST SUMMARY
### HUNTER DAWKINS
April 26, 2006

| CATEGORY | COST |
|---|---|
| DRUGS AND SUPPLIES | $392,907.02 |
| EVALUATIONS | $1,300.00 |
| COMMUNITY LIVING SERVICES | $1,870,544.00 |
| MEDICAL ROUTINE | $34,990.00 |
| THERAPIES | $91,728.00 |
| LIFETIME TOTAL | $2,391,469.02 |