

Paul Fedio, Ph.D.
*Clinical Neuropsychology*
9408 Raintree Road
Burke, Virginia 22015

Telephone: (703) 426-7246
Telecopier: (703) 426-4223

## Neuropsychological Evaluation

15 May 2007

Name: Dawkins, Hunter
Date of Birth: 18 March 1983
Age: 23 years
Dates of Evaluation: 10 and 11 February 2007

Tests and Procedures:
Wechsler Adult Intelligence Scale –III: Intelligence Quotients [IQ]:

| Date | 2005 | 2006 | 2007 |
|---|---|---|---|
| Verbal IQ: | 84 | 110 | 104 |
| Performance IQ | 78 | 90 | 91 |

| Domains | Index Scores | |
|---|---|---|
| | 2006 | 2007 |
| Verbal Comprehension | 109 | 107 |
| Perceptual Organization | 99 | 99 |
| Processing Speed | 71 | 66 |
| Working Memory | 108 | 99 |

Wechsler Memory Scale–III (WMS-III): Memory Indexes:

| Domains | Immediate | | Delayed | |
|---|---|---|---|---|
| | 2006 | 2007 | 2006 | 2007 |
| Auditory | 102 | 99 | 111 | 111 |
| Visual | 97 | 100 | 97 | 97 |
| Auditory Recognition | | | 110 | 120 |
| Working Memory | 91 | 85 | | |

Boston Naming; Verbal Fluency; California Verbal Learning [CVLT-II]; Rey-Osterrieth Complex Figure; Post-Distractional Memory; Trails (A & B); Grooved Peg Board; Delis-Kaplan Executive Functioning [select items]; Test of Malingered Memory [TOMM]; Personal Injury Checklist; Beck Depression Inventory (BDI-II); Neurobehavioral Functioning Inventory (NFI-R); Clinical Interview; Records' Review

OVERVIEW: Mr. Dawkins did not encounter any developmental, psycho-educational or neuropsychiatric problems prior to the vehicular accident in question [April 2005]. He sustained multiple injuries, including a significant head trauma but embarked on an impressive rehabilitative course of recovery. Post-accident psychometric studies identified a mild to moderate decline in

select cognitive areas along with visual and auditory sensory changes. To his credit, however, Mr. Dawkins has been very effective in harnessing his residual cognitive and emotional resources. He is living independently, managing his own affairs, working steadily and enrolled in graduate studies. Currently, he would benefit from accommodations in graduate studies but should be able to complete the requirements for a M.A. degree. Relatedly, he will be able to independently manage his personal and social affairs, and be employed competitively in spite of residual problems associated with the accident.

The present results essentially replicated former findings and show an impressive recovery which discounts any presumption that Mr. Dawkins is severely impaired. Test wise, he did not withhold effort or display intent to amplify his cognitive losses for secondary gains. Therapy and counseling would be very valuable in helping him acclimate to his post-accident changes and to deal more effectively with his tendency for alcohol abuse which is impacting his recovery and functioning.

BACKGROUND INFORMATION: Mr. Dawkins tracked the traditional developmental motor and language milestones at an unimpaired pace, and held his own academically. He noted that his academic grades loaded mostly with As and Bs although he conceded that he was 'rebellious' and that his grades were lower and sprinkled with Cs during his freshman year in high school. However, he worked hard and "never got another C in high school" and graduated with honors. He was a National Honor Society member and was very active in extra-curricular activities/sports, and graduated with a 3.5 grade point average [G.P.A.]. It is interesting to note, however, that he reportedly earned average scores on the Scholastic Aptitude Test [SAT]: 500 Verbal and 510 Math. He also developed political interests and served as a page for the Lt. Governor and Governor of Mississippi. He acknowledged that this mindset was nurtured at home by his mother who is a state senator and by his father, a practicing urologist. Mr. Dawkins attended the Catholic University of America (CUA), Washington D.C. and graduated in 2005 with a 3.6 G.P.A. While at CUA, he interned with members of Congress and was living independently and off-campus.

Mr. Dawkins' psychosocial record was essentially stable except for periods of excessive alcohol use; he denied that this practice affected his college studies or job performance. His post-graduation plans, however, were altered several weeks before graduating when he sustained a traumatic head injury in a vehicular accident on 16 April 2005; his blood alcohol level was reportedly elevated. Parenthetically, the accident happened on his sister's birthday. Since his

medical records for the accident and his treatment are extensive, only certain information will be referenced and as it bears on the present neuropsychological findings and impressions.

The medical records indicate that Mr. Dawkins was an unbelted, rear seat passenger and was rendered unconscious. It reportedly took about 30 minutes to extract him from the overturned vehicle. He was emergently admitted to MedStar Trauma Bay, Washington Hospital Center in an unresponsive state and a Glasgow Coma Scale [GCS] of 3. On 22 April, approximately 7 days following admission, his Glasgow Coma Scale improved to 6, but he was not following commands and was disoriented. On 4 May 2005, 2 weeks after the accident, he underwent a percutaneous endoscopic grastrostomy with no medical complications. The admitting diagnosis at the Washington Hospital Center was: "open fractured skull base with hemorrhage, unconsciousness, unspecified duration". From a neuroimaging perspective, a series of CT and MRI brain scans revealed multiple contusions on the left frontal and temporal lobe and a large contusion in the left frontal region, adjacent to a skull fracture.

Mr. Dawkins continued to make significant headway and on 10 May 2005, about 3 weeks after the accident, he was transferred to the National Rehabilitation Hospital (NRH) for further treatment and diagnostic study. A screening mental status examination was completed on 6 June 2005 by Dr. Russell who described him as alert but disoriented to place and status. His speech was slow but fluent and contained paraphasic errors. His language comprehension was basically good but he was inconsistent in following multiple-stage commands. And his working, as well as immediate, memory was impaired. Emotionally, he was described as pleasant and euthymic and his mood was congruent, although his mother referred to transient periods of depression. On 2 July 2005, almost 3 months after the accident, he was discharged to his residence in Washington, DC, under the care of his family while continuing to attend a day treatment program with NRH.

Mr. Dawkins returned to his birth home in August 2005 and lived in an apartment complex where his mother also resided. He was enrolled in a treatment program at the Methodist Outpatient Rehabilitation Program, Flowood, Mississippi. On site examinations established that he was alert, cooperative, verbose and tangential. He had a word finding-substitution problem and his motor strength was weak bilaterally [R>L]. Examination of sensory-motor systems also revealed blindness in his left eye [traumatic optic atrophy] and a hearing loss in the right ear.

## FORMER NEUROPSYCHOLOGICAL AND PSYCHOLOGICAL EVALUATIONS:

An evaluation on 23 September 2005, 5 months after the accident was completed at the Methodist Outpatient Rehabilitation Center and noted that Mr. Dawkins participated actively in individual and group therapy. He received physical, occupational and speech/language therapies that targeted ambulation, balance, strength, coordination, as well as expressive language skills, problem solving and memory. These original test reports referred to motor weakness and marginal to average memory for verbal material. Verbal fluency was impoverished, as was reading comprehension. Intellectually, he was operating within the low average range for verbal skills, and borderline range for nonverbal skills: Verbal IQ = 84; Performance IQ = 78. The examiner estimated that Mr. Dawkins' native or baseline intelligence was probably higher and within the average [90 to 109] to high average range [110 to 119].

Mr. Dawkins also underwent a neuropsychological evaluation by Drs. Irby and Bennett in April 2006, about one year after the accident which revealed substantial gains vs. an earlier study in September 2005. The second examination noted a dulled processing speed. His verbal fluency and memory improved to the low average-average range while his visual spatial memory remained lower. Reading rate and comprehension were slow while single word reading was intact. Motorically, his hand strength and manual dexterity were impaired bilaterally [R>L].

The second assessment described Mr. Dawkins' speech as appropriate but slow and dysfluent; memory was much improved by cuing. Executive skills involved in planning and organization were average. His test performance on academic measures of reading, mathematics, written and oral language was much improved and average to above average in comparison with the earlier evaluation. With regard to emotionality, Mr. Dawkins displayed a favorable attitude and eagerness to cooperate. While his intent and plan to enroll in graduate school was viable, the examiner recommended that he should begin slowly, on a part time basis, and request accommodations.

The examining neuropsychologist also added concern about Mr. Dawkins' poor judgment after the accident and his reactivation of using alcohol excessively. He had begun to drink beer daily, alone and in company, even though he was cautioned against this practice by medical specialists; he was also warned about the risk for dulling his recovery and having epileptic seizures. At the time, Mr.

Dawkins also admitted that he had resumed driving contrary to medical restrictions. These noncompliant behaviors signaled a compromise in judgment.

Mr. Dawkins had an independent psychiatric examination in March 2006 by Dr. Cook who formulated a diagnosis of a major depressive disorder, single episode, with traumatic brain injury. During this time, however, Mr. Dawkins continued to make significant gains: he started a part time job (20 hours/week) as an intern in the Mississippi Attorney General's office. A concern was attached, calling attention to persistent cognitive impairment and mild defects in personal and social behavior. And on 13 January 2006, Mr. Dawkins resumed driving privileges after passing a driver's test, but with some restrictions.

A more recent and partial psychological evaluation was completed by Dr. Filson on 10 November 2006. The results referred to cognitive difficulties in speech/language and executive arenas but did not identify the source [psychometric tests]. Dr. Filson opined that Mr. Dawkins will probably face ongoing and permanent neurocognitive losses and that his lack of insight may be a drawback with regard to self-regulation and behavioral improvement. It was recommended that Mr. Dawkins engage psychotherapy and prescribed medication. The examiner added that Mr. Dawkins was moderately depressed and in need of treatment, which Dr. Filson appears to have undertaken on a continuing basis.

Finally and on a positive note that speaks well to Mr. Dawkins' test taking attitude, all former examiners agreed that Mr. Dawkins did not deliberately withhold test effort, malinger or amplify his cognitive and emotional problems. The present examiner agrees fully with this impression.

**GENERAL OBSERVATIONS:** At examination, Mr. Dawkins still has dense anterograde amnesia but retains some patchy personal memories for events before the accident. His last memory before the accident, for example, was 'going to Wendy's restaurant to use the restroom'; about 15 to 20 minutes later, he was involved in the accident. His first post accident personal memory was delusional in that he 'saw himself in a wheelchair talking to a priest outside an oriental garden'; a reality check failed to confirm this location and episode. He has a memory for 'waking up in the National Rehabilitation Hospital in July about 3 months after the accident'. This period represents an extensive anterograde period of amnesia but needs to be adjusted for the

effects of medication. Mr. Dawkins denied any major change in taste or smell, but stated that his hearing [right ear] was defective and that he was blind in his left eye after the accident.

Before the accident in question, Mr. Dawkins drank excessively but claimed that this practice was limited primarily to weekends. He boasted that he never failed to attend a single class to honor obligatory commitments because of "drinking". He usually drank at least one 12 pack of beer on each weekend day but denied binging. He acknowledged that he had begun to drink excessively after the accident and contrary to medical advice, but he "has not had a single beer since Thanksgiving [2006]". He discounted using controlled substances before and after the accident.

Mr. Dawkins applied to several law schools before the accident and reported that he did well on the LSAT, earning a score of 1160 which placed above the median level [1150]. He stated that he was accepted into Loyola and Tulane University Law School [Louisiana] and was accepted into George Washington University [GWU] graduate program [M.A.] in Politics/Government. More recently he enrolled at GWU last semester [September 2006] and reportedly "got and A in both classes [U.S. Presidents and Executive Legislation Relations]". He reportedly did not request any special educational accommodations which speak favorably to his recovery.

Mr. Dawkins is currently enrolled in 4 courses at GWU (Congress, Media and Foreign Policy, Introduction to Political Analysis and Politics, and Public Policy). He reports that he is doing well but working hard to maintain a good standing while also holding a job; his final grades were not available for review. On a clinical aside, Mr. Dawkins should be encouraged to contact the special educational services at school and request special accommodations. At the same time, he may be pressing his resources by working full time and taking a heavy course load. Instead, he should consider a reduced class schedule if he continues to work full time; a similar recommendation was formulated earlier by Dr. Irby.

Mr. Dawkins' work ethic and rehabilitation/recovery are impressive and he is to be commended for joining the competitive job market, shortly after the trauma. Last year, for example, from April to August 2006, he worked as an administrative clerk in the office of the Mississippi Attorney General's Office. And, since August 2006 and continuing to the present, he is employed as a legislative assistant in the office of Congressman Jean Taylor (Mississippi). His duties consist

primarily of reviewing mail and requests from constituents and other parties, and forwarding these to appropriate personnel for a response. At times, he independently prepares replies but admits that he has trouble writing by hand and prefers to use a keyboard and template. His responses are usually reviewed and edited by coworkers and supervisors. Mr. Dawkins stated that he enjoys his present job and coworkers, but the quality and timely delivery of his work is being challenged by one coworker; his supervisors in turn, are very supportive of his work and there is no indication that this job is in jeopardy or that he will receive poor performance appraisals.

Currently, Mr. Dawkins is living independently and alone in an apartment on Connecticut Avenue, Washington, D.C. He uses public transportation to get to and from work and to attend classes at GWU. He does not receive any one-on-one supervision or assistance in daily living, and in fact, he independently cooks, does his own laundry, shops, does homework, pays bills, etc. When queried about his cooking skills, he stated that his father was an excellent chef in college and 'taught him how to cook different foods'. In fact, Mr. Dawkins claimed d that his culinary skills were recognized and shared with his colleagues on the CUA campus. In this regard, he is currently very self-sufficient and self-contained, and has made a remarkable recovery from a major accident, albeit with residual changes. In this context, there is no need to secure the services of a case manager. In fact, it would be more beneficial if Mr. Dawkins was not thrust into a dependency role; he should be encouraged to apply his abilities maximally and independently.

At examination, Mr. Dawkins was neatly and casually dressed and displayed a very positive and engaging demeanor. He was friendly, relaxed and very attentive and presented no idiosyncratic comments or deportment. During the interview and evaluation, however, Mr. Dawkins emitted an audible respiratory wheezing sound and a mild 'droopy eye/squint'. His speech was fluent but tinted with a mild speech impediment and occasional word finding problem. At times, he became tangential in conversation, but in the main, was focused, attentive and well intentioned.

## TEST DATA AND IMPRESSIONS
**Intelligence:** Mr. Dawkins' current performance on standard measures of intelligence [WAIS-III] placed within the same range that was reported in 2006. These pooled and consistent data indicate that he has made a good recovery from an earlier evaluation and poorer scores in September 2005

[see Fig 1] which was obtained in September 2005, only 5 months after the accident. His present performance shows that he has rebounded well.

**Language Skills**: Mr. Dawkins earned a Verbal IQ of 110 in 2006 and currently, a closely aligned Verbal IQ 104; there was no evidence of decline. He controls good verbal comprehension and a working vocabulary [Fig 1A]. Independent measures of linguistic processing were taken with a fluency test where Mr. Dawkins had to generate different phonemic and semantic exemplars or words beginning with the letters "f, a, and s" or naming different animals within one minute. His output was dysfluent in each case and in comparison with age matched peers. A mild dysphasia was detected with the Boston Naming Test where he correctly named only 38/60 pictorial items and an additional 10 items with phonemic cueing. At the same time, the present and past test results discount a reading disorder or dyslexia.

**Visuomotor Coordination and Spatial Perception**: Mr. Dawkins did poorly in this cognitive area, showing repeatedly that his Performance IQ has scored consistently below his Verbal IQ [Fig 1A.]. For example, when he had to insert 25 tiny metal rods into recessed grooves of a pegged board, he did far better with his right and dominant hand. Relatedly, his ability to organize spatial information was better (Index =99), but he was slow in learning to associate symbols and numbers and in matching same/different attributes of visual stimuli. A perceptuomotor problem was confirmed when he attempted to draw the complex Rey figure where he used an unorthodox and piecemeal approach. And when he attempted to draw the same design immediately from memory, he forgot some of the details; a similar observation was made by Dr. Irby in April, 2006.

**Attention and Working Memory**: Mr. Dawkins' performance on a variety of attention tasks, either focused on simple or complex stimuli, was marginal, especially if divided attention and multitasking were required. Here, his processing speed was poor (Index = 66 currently, and 77 in 2006). As an example, when he had to connect a single series or alternating series of stimuli, his performance slipped below age matched norms although his perception of left-right directional cues was very good. Testing also revealed that he was slow with a divided attention task where he had to name colors, read words of colors, and identify the ink colors of words representing different colors [Stroop Task]. And when he had to shift back and forth between 2 procedures, he was slower, confirming moderate problems in multitasking or doing 2 different things at the same

time [Indexes of 85 now, and 91 in 2006, Fig 2.]. Thus, Mr. Dawkins probably would do best in situations where he is given a limited number of assignments and allowed to complete them before moving on to others. In applying this to an academic setting, he would benefit from special accommodations such as getting extra time to take tests, being given multiple choice, recognition type of exams vs. essay types; preferential seating, etc; similar recommendations were tendered by Dr. Irby in his 2006 neuropsychological report.

**Memory and Learning:** Figure 2 clearly illustrates considerable variability that ranges from low average [Index of 85] to superior [Index of 120]. The data in Fig 2 confirm good recovery over the past year and illustrate that his auditory verbal memory for the content of short stories and lists of words, both immediately and after a delay, were relatively intact [Indexes of 99 and 111]. And the same efficiency was seen when he had to remember nonverbal materials such as pictorial scenes and facial photographs [Indexes of 100 and 97, respectively]. These data suggest that he does not forget newly learned information at an accelerated rate. In fact, his superior recognition [Index = 120] suggests that he does well in encoding and registering new or unfamiliar information, but he may be less effective in recalling or retrieving information spontaneously. Recognition paradigms and cuing are excellent ways of helping Mr. Dawkins gain access to his memory registers and retrieve stored information [Fig 2].

Another example of average learning and retention skills was seen with the California Verbal Learning Test [CVLT-II] currently and in 2006 [Fig 3]. Here, Mr. Dawkins was directed to memorize 16 words across 5 trials; the words could be clustered into categories to facilitate learning. He was not impaired in learning this word list and did very well in remembering the words both immediately and after a delay. The addition of a separate list of words did not produce a major impediment [retrograde interference] in remembering the original word list. Measures of primacy and recency also indicated that he did well in transferring information form short into long term memory registers without an accelerated rate of decay or forgetting.

A self-appraisal of his memory skills and other behavioral dimension revealed that Mr. Dawkins' has some insight into his difficulties but tends to underestimate some of his problems. He ranked his memory before the accident as superior and intact and still rated himself above average on the

same parameters at the present time. He does not view himself as being impaired and continues to hold an optimistic mindset that supports his intent to do well and fully apply his resources [Fig.4].

**Emotionality:** Whereas there were passing references to a reactive depression, Mr. Dawkins current response to the Beck Depression Inventory yielded a very low score that was well within normal limits. And when he was administered the Neurobehavioral Functioning Inventory (NFI-R), a standard rating test for traumatically brain injured individuals, he did not rate depression as a major affective problem. Analysis of his responses indicates that he may be lonely and has difficulty initiating social interactions [Fig 4]. Regarding libidinal interest and energy, he noted that sexual performance has not become a problem after the accident but interpersonal opportunities were limited, which he attributed to his demanding work and study schedule. He acknowledged that he has become more irritable and may be prone to flashes of anger.

In short, Mr. Dawkins' past record did not reveal any major psychopathology although his alcohol use signaled a serious problem area. He denied a record of DUIs/DWIs and was never dismissed from a job for alcohol related problems. Currently, he has recovered very well and is applying his resources and abilities maximally. His positive attitude and mindset to succeed will carry him a long way and ensure his success in completing graduate studies, earning a M.A. degree and engaging a political/legal career. However, his future progress and success may be cut short by his drinking problem.

**Test of Memory Malingering:** Currently and as noted in all former examinations, Mr. Dawkins was described as being highly motivated to do his best. Actually, his performance on the Test of Memory Malingering [TOMM] and other measures clearly established that he did not withhold or manipulate effort or that he intended to mislead others and to cast himself in a negative light. To the contrary, he tends to play down or minimize his deficits. The present results, therefore, are offered as a valid estimate of his current level of functioning and dysfunctioning.

## SUMMARY AND RECOMMENDATIONS

The current evaluation established that Mr. Dawkins has made a remarkable recovery from the effects of a traumatic head injury, although some residual accident related problems persist. Currently, he operates within the average to high average range of cognition and at levels

commensurate with his pre-accident baseline level of functioning. Nonetheless, he has some difficulty processing information rapidly and in multitasking. His visual and auditory problems need to be taken into account even though he has adjusted well. At the same time, he does relatively well in learning and retaining information but is less efficient in recalling or retrieving information spontaneously; cuing helps immensely.

Emotionally, Mr. Dawkins may be prone to intermittent and short-lived, but not dangerous bursts of anger. These paroxysmal episodes are infrequent and can be addressed by therapy and pharmacotherapy. Overall, he could benefit from weekly counseling for the next year or two; his positive attitude and determination to succeed make him an excellent candidate for individual and/or group therapy.

Based on Mr. Dawkins' pre-accident academic and job success and standard test scores, he probably commanded at lease average to high average intelligence. Currently, he has made a remarkable recovery in spite of some dulled cognitive performance, more so in visual motor than in language areas. His residual cognitive resources, reinforced by a positive mindset and attitude to do well, will enable him to complete the requirements for an M.A. degree. Career wise, he retains the skills and motivation to succeed in the open and competitive job market, and in fact, he is currently employed and reportedly doing well while enrolled in several graduate classes.

The present findings and recommendations, in fact, complement those offered by Dr. Irby and indicate that Mr. Dawkins can maintain an independent lifestyle and be gainfully and competitively employed. In fact, he is currently employed, lives alone, is self-sufficient, and retains the attitude and resources to handle and overcome challenging life and career problems. It would suit him very well to receive systematic and individual counseling and judicious use of medication and assistance in acclimating to the changes associated with the trauma in question. Finally, his recovery and success will also depend on treating his alcohol abuse.

Paul Fedio, Ph.D.
Clinical Neuropsychologist